**Raymond Ludwig FROST,
Plaintiff–Appellant,**

v.

**Thomas AGNOS, Sheriff, et al.,
Defendant–Appellant.**

**Raymond Ludwig FROST,
Plaintiff–Appellant,**

v.

**Arthur HUFFMAN, External Referee, Maricopa County Sheriffs Office; Commander Seeverson, Detention Bureau; L Headquarters Commander, Cpt; William F. Williams; D. Alster, Lieutenant; SG Flecher; et al. Defendants,**

**and**

**Officer Jackson; Officer Coffman, Defendants–Appellees.**

Nos. 94–15640, 96–17332.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 14, 1998.

Decided Aug. 13, 1998.

Nancy C. Luebbert, Terri R. Pickens, Legal Interns, Maureen E. Laflin, Supervising Attorney, University of Idaho College of Law Legal Aid Clinic, Moscow, Idaho, for the plaintiff–appellant.*

John W. Paulsen, Deputy County Attorney, Phoenix, Arizona, for the defendant–appellee.

Before: GOODWIN, FLETCHER and D.W. NELSON, Circuit Judges.

Opinion by Judge D.W. NELSON; Partial Concurrence and Partial Dissent by Judge GOODWIN.

D.W. NELSON, Circuit Judge:

Arizona state prisoner Raymond Ludwig Frost, a former Maricopa County detention officer, appeals the district court's summary judgment dismissal of all but one of the claims listed in his 42 U.S.C. § 1983 complaint. Frost also appeals the district court's decision to deny as untimely his demand for a jury trial to resolve his remaining claim.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse and remand in part.

### BACKGROUND

While engaged in a gunfight with police officers, Frost sustained bullet wounds in both legs. He subsequently was apprehended and charged with the attempted murder of a police officer, kidnapping, and armed robbery. For the duration of his incarceration as a pretrial detainee, Frost was classified as a high-security, close custody inmate.

Because a bullet had pulverized his right tibia, Frost underwent surgery at the Maricopa County Medical Center ("Medical Center") on June 10, 1988; his right leg was placed in a long-leg cast and he was required to use crutches. Frost remained in the detention ward of the Medical Center until June 21, 1988, when he was transferred to the infirmary of the Madison Street Jail. On July 11, 1988, Frost was transferred out of the infirmary and into the maximum administrative segregation ward on the sixth floor of the Madison Street Jail.

In his complaint, Frost claims that the conditions of his confinement resulted in further injury to his leg. For example, he alleges that he had difficulty showering because he was unable to maneuver his crutches on the slippery bathroom floor and over the wall surrounding the shower. As a result, he often fell on his injured leg. Although jail officials placed Frost in the handicapped housing unit for a brief duration, he later was returned to a cell that lacked adequate handicapped shower facilities. Moreover, he asserts that he slipped several times as he attempted to carry his food-tray while balancing himself on crutches.

On February 1, 1989, Frost re-broke his leg in the jail's recreation area. To reach the recreation area, Frost was required to climb forty-eight stairs. Usually, detention officers assisted Frost by carrying his crutches as he hopped up the stairs, using his free hands to grasp the handrail. Officers Coffman and Jackson, however, refused to assist Frost with his crutches. Although Frost was able to climb the stairs without assistance, he reinjured his leg after climbing the stairs and entering the recreation area. Frost asserts that his injury resulted from putting too much weight on his leg, and that his injury could have been avoided had the officers been willing to carry his crutches for him.

Frost filed his first complaint on July 12, 1990, alleging numerous violations of his civil

---

* We commend pro bono counsel for their outstanding performance at oral argument and for their fine legal work on this case.

rights due to the acts and omissions of Maricopa County Sheriff's Office employees (collectively, "Defendants"). The complaint named twenty-one defendants, including Officers Jackson and Coffman. Service on Officer Jackson, however, was returned because Frost did not list her first name on the summons.

On December 5, 1991, Defendants filed a motion for summary judgment. On September 29, 1993, the district court granted summary judgment in favor of Defendants on all claims, with the exception of Frost's claim stemming from certain unidentified Defendants' (later determined to be Officers Coffman and Jackson[1]) refusal to carry his crutches up the stairs and into the recreation area.

Frost filed a demand for trial by jury on October 22, 1993. On January 19, 1994, Magistrate Judge Morton Sitver granted Frost's motion to amend but denied his demand for a jury trial as untimely. He also sua sponte dismissed all of Frost's claims except the claim relating to Defendants' failure to assist Frost with his crutches. Frost filed a petition for permission to appeal, which we construed as a notice of appeal.

Officers Coffman and Jackson filed a joint answer to the amended complaint on January 26, 1994. The remaining cause of action against Officers Coffman and Jackson was resolved pursuant to a bench trial before the Honorable Charles L. Hardy on October 8, 1996. The district court found that although no legitimate penological reason justified Officers Coffman and Jackson's refusal to assist Frost with his crutches, they lacked subjective awareness of the risk their refusal posed. Thus, the district court concluded that they were not deliberately indifferent to Frost's medical needs. Frost timely appeals.

## STANDARD OF REVIEW

■ A decision to grant summary judgment is reviewed de novo. *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1330–31 (9th Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998).

Facts and inferences must be construed in favor of the non-moving party, and the moving party must establish that no disputed issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997). Entitlement to a jury trial is a question of law subject to de novo review. *United States v. California Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1377 (9th Cir. 1997).

## DISCUSSION

■ Claims by pretrial detainees are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, however, we apply the same standards. *See Redman v. County of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991).

■ To determine whether the conditions of Frost's confinement constituted cruel and unusual punishment, we must assess whether Frost was deprived of the "minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). If so, a prison official may be held liable if he acted with "deliberate indifference" to a substantial risk of serious harm. Mere negligence is not sufficient to establish liability. *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Rather, the official's conduct must have been "wanton," which turns not upon its effect on the prisoner, but rather, upon the constraints facing the official. *Wilson*, 501 U.S. at 302–03, 111 S.Ct. 2321.

### I. The Conditions of Frost's Confinement

### A. Failure to Accommodate Frost's Disability

■ Frost argues that by refusing to provide an accessible environment, jail officials

---

1. Defendant Jackson married and changed her name to Ransom. Prior to the bench trial, however, she changed her name back to Jackson.

failed to take reasonable measures to guarantee his safety, thereby violating his constitutional rights. For example, Frost claims that because he was forced to live in cells that did not have accessible shower facilities, he slipped and injured himself. Moreover, although he submitted several grievance forms to advise jail officials of the risk he faced, and although a prison doctor stated that he should be placed in the handicapped unit, prison officials declined to accommodate him. Frost concludes that Defendants knowingly subjected him to the risk of falling, thereby exhibiting a deliberate indifference to his well-being.

Defendants insist that slippery shower floors cannot establish a constitutional claim. Their characterization unfairly trivializes Frost's claim. Because Frost was on crutches, he fell and injured himself several times. Prison guards were aware of this. Slippery floors without protective measures could create a sufficient danger to warrant relief. *See LeMaire v. Maass,* 12 F.3d 1444, 1457 (9th Cir.1993) (holding that inmates are entitled to be protected from unsafe prison conditions). Frost's repeated injuries and the unsafe conditions that follow from his use of crutches distinguish this case from *LeMaire,* upon which Defendants rely, and *Jackson v. State of Arizona,* 885 F.2d 639, 641 (9th Cir.1989) (holding that slippery floors, by themselves do not constitute cruel and unusual punishment).

Whether prison officials must provide handicapped-accessible accommodations for a pretrial detainee who wears a leg cast and relies on crutches presents an issue of first impression in our court. In resolving the issue, we recognize that the definition of cruel and unusual punishment is subject to "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As a society, we have grown increasingly sensitive to the need to accommodate individuals with disabilities. Notably, the Supreme Court recently held that Title II of the Americans with Disabilities Act covers inmates in state prisons. *See Pennsylvania Dep't of Corrections v. Yeskey,* —— U.S. ——, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). Other courts have found that the failure to provide handicapped accessible bathroom facilities may give rise to a constitutional claim. *See, e.g., LaFaut v. Smith,* 834 F.2d 389, 392–94 (4th Cir.1987) (finding that the failure of prison officials to ensure that mobility-impaired inmates had accessible toilet facilities resulted in the violation of the prisoner's constitutional rights); *Casey v. Lewis,* 834 F.Supp. 1569, 1582 (D.Ariz.1993) (holding that failure to accommodate disability by providing adequate shower facilities violated constitutional rights).

Defendants concede that they did not accommodate Frost's need for accessible shower facilities. They argue, however, that Frost's close custody classification precluded them from placing him in the handicapped housing unit. We are sympathetic to the security constraints Defendants faced in housing Frost, a former detention officer charged with the attempted murder of a police officer. Nonetheless, although Frost's classification was related to a legitimate penological interest, a close custody classification does not relieve jail officials of the duty of providing for his safety.

Moreover, although we recognize the wisdom of deferring to prison officials' considered judgment regarding the proper way to administer a prison, *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), Defendants are not excused from taking reasonable measures to assist Frost in showering safely. Frost suggests a variety of options that he alleges would have met his safety needs. For example, he contends that he would have been aided by a chair in the shower, a handicapped bar, or the provision of extra guards to assist him. The fact that such basic steps could have better guaranteed Frost's safety provides evidence that Defendants were deliberately indifferent in failing to provide any accommodations whatsoever. Accordingly, we conclude that a triable issue of fact exists with regard to whether the failure to provide Frost with adequate shower facilities resulted in the violation of his constitutional rights, and we reverse and remand on this issue.

■ Frost also complains that the method utilized to deliver food posed a significant safety risk to him. Frost has provided no evidence of deliberate indifference, however.

Frost never informed Defendants that he was having trouble with his food tray, and the risk was not obvious enough to infer subjective awareness of a substantial risk of harm. Thus, although Frost has shown that Defendants may have violated his rights by failing to provide an accessible shower, he has not shown that they acted with deliberate indifference in failing to assist him with his food tray.

### B. *Close Custody Classification*

Frost asserts that he was improperly classified as a close custody inmate. We reject this claim because prison officials "should be accorded wide-ranging deference in the adoption of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 540, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Nothing in the record before us suggests that the security classification system is not "reasonably related" to legitimate penological interests, and therefore, constitutional. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

### C. *Other Conditions of Confinement*

Frost asserts a myriad of additional complaints regarding the conditions of his confinement. We find them to be without merit. For example, although Frost complains that he was denied the opportunity to participate in outdoor recreation, Defendants have provided evidence showing that he was denied recreation on only one occasion because a prison official misunderstood a note in his file to be a security override. This one-time, accidental denial of recreation cannot support a constitutional claim. *Compare Knight v. Armontrout,* 878 F.2d 1093, 1095–96 (8th Cir.1989) (holding that denial of recreation for thirteen days is not cruel and unusual punishment) *with Spain v. Procunier,* 600 F.2d 189, 199–200 (9th Cir.1979) (holding that complete ban on any outdoor exercise was unconstitutional).

Similarly, although Frost complains about the temperature in his cell, the conditions in the Medical Center, and the conditions in the temporary holding cell, he has not shown that such circumstances ultimately deprived him of the "minimal civilized measures of life's necessities." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The district court correctly granted summary judgment on these claims.

### II. *Frost's Medical Claims*

To hold that Defendants violated Frost's right to adequate medical care, we must find that the officials acted with deliberate indifference in failing to respond to a serious medical need. *Estelle,* 429 U.S. at 104–05, 97 S.Ct. 285. Mere negligence in the provision of medical care, however, does not constitute a constitutional violation. *Id.* at 105–06, 97 S.Ct. 285. Accordingly, we find no merit in Frost's claims stemming from alleged delays in administering his pain medication, in treating his broken nose, and in providing him with a replacement crutch. Although prison officials may have acted negligently, Frost has not established that prison officials acted with deliberate indifference in tending to his medical needs.

### III. *Frost's Liberty Interest*

Frost also complains that he was given amitriptyline, an "antipsychotic drug," in violation of his constitutionally protected liberty interest. Under *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), prison officials may not forcibly administer an antipsychotic drug to a criminal defendant unless they first comply with certain procedural safeguards. *Id.* at 217, 110 S.Ct. 1028. Although Defendants concede that Frost was given amitriptyline, they maintain that he was never forced to take it against his will. To the contrary, when Frost informed the administering nurse that amitriptyline was making him sleepy, she simply noted his refusal on his medical chart.

Nonetheless, Frost insists that he was "tricked" into taking amitriptyline by the nurse, who informed him that it was a pain medication. He further claims that had he known that it had "antipsychotic" effects, he would not have taken it. On remand, it should be determined whether amitriptyline is an antipsychotic drug and if so, whether procedural safeguards were necessary before

administration, and if so, were taken before its administration to Frost.

## IV. *Denial of Frost's Request for a Jury Trial*

Frost argues that the magistrate judge erred in denying his demand for a jury trial as untimely. Under Federal Rule of Civil Procedure 38(b):

Any party may demand a trial by jury of any issue triable of right by a jury by (1) serving upon the other parties a demand therefore in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue....

Fed.R.Civ.P. 38(b).

"When defendants are jointly liable on a cause of action that contains 'any issue triable by a jury,' a jury demand as to that issue is timely if served within 10 days after service of the last defendant's answer." *Bentler v. Bank of America Nat'l Trust and Sav. Ass'n*, 959 F.2d 138, 141 (9th Cir.1992) (quoting Fed.R.Civ.P. 38(b)); *see also In re Kaiser Steel Corp.*, 911 F.2d 380, 388 (10th Cir.1990) ("Where there are multiple parties, the last pleading by any party on a common issue will determine the time for jury demand."). Although Officer Jackson had been named as a defendant in Frost's original complaint, and although her refusal to assist Frost with his crutch was included as a cause of action, Frost had been unable to serve Officer Jackson because he did not know her first name, and thus, service was returned unexecuted. Officer Jackson did not file an answer prior to Defendants' appearance at the motion for summary judgment. Accordingly, although Frost's demand for a jury trial was filed on October 22, 1993, more than ten days after all other Defendants had appeared in the action by filing a motion for summary judgment, Officer Jackson was not yet a party.

Because Frost made his demand for a jury trial prior to the filing of Officer Jackson's answer, he never waived his right to a jury trial on the crutch incident. Thus, the district court erred in denying Frost's request for a jury trial.

An erroneous decision to decline a demand for jury trial is "harmless if no reasonable jury could have found for the losing party, and the trial court could have granted a directed verdict for the prevailing party." *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516–17 (9th Cir.1985). Based on the evidence submitted, a reasonable jury could have found that Officers Coffman and Jackson were subjectively aware of the risk faced by Frost due to their refusal to assist him with the crutches. Thus, the district court's decision to deny Frost's request for a jury trial was not harmless. We therefore reverse and remand for a jury trial to determine whether or not Officers Coffman and Jackson violated Frost's constitutional rights by failing to assist him with his crutches.

## CONCLUSION

For the reasons above, we reverse the district court's grant of summary judgment on Frost's claim regarding the shower conditions. We remand for determination of whether Frost was administered an antipsychotic drug without proper procedural safeguards. We reverse the district court's denial of Frost's request for a jury trial on the claim stemming from the failure of Officers Coffman and Jackson to assist him with his crutches. We affirm the district court's decision to grant summary judgment on all other claims.

GOODWIN, Circuit Judge, Dissenting in part, Concurring in part:

I respectfully dissent from that part of the majority opinion which grants any relief to the appellant. It is apparent from the fact set forth by the majority that this prisoner has been amusing himself by engaging in recreational litigation. The trial judges who have been dealing with these cases for the last four years were correct in terminating the cases at the motion stage. Even if every claim made by the prisoner were factually true, no federal constitutional right has been violated by the named defendants, and Rule 12(b) dismissals were properly granted for failure to state a claim. The claims that got beyond Rule 12 were also properly disposed of on the merits. Every disagreement between a prisoner and his keepers about the management of the institution is not a consti-

tutional question. I concur in those portions of the careful and conscientious opinion which affirmed the district court, but I cannot concur in federalizing in constitutional terms the garden variety grievances described by this disgruntled former officer, now experiencing detention in admittedly less than ideal circumstances.