**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EDWARD TERRAN FURNACE, *Plaintiff-Appellant*, <br><br> v. <br><br> PAUL SULLIVAN, CO; D. MORALES, CO; J. SOTO, CO, sued in their official and individual capacities, *Defendants-Appellees*. | No. 10-15961 <br><br> D.C. No. 3:07-cv-04441-MMC <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, Senior District Judge, Presiding

Argued and Submitted
November 6, 2012—San Francisco, California

Filed January 17, 2013

Before: Robert D. Sack,[*] Ronald M. Gould,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Robert D. Sack, Senior Circuit Judge for the U.S. Court of Appeals for the Second Circuit, sitting by designation.

## SUMMARY[**]

### Prisoner Civil Rights

The panel reversed in part and affirmed in part the district court's summary judgment in a 42 U.S.C. § 1983 action brought by a prison inmate who alleged that prison officials violated his Eighth Amendment rights by spraying him with an excessive quantity of pepper spray, and violated his Fourteenth Amendment rights when they denied him a vegetarian breakfast.

The panel reversed the district court's summary judgment in favor of prison officials on plaintiff's Eighth Amendment claim, determining that the district court failed to draw all inferences in plaintiff's favor when resolving the issue of qualified immunity. The panel concluded that given the facts, as alleged by plaintiff, a significant amount of force was employed without significant provocation from plaintiff or warning from the officers. The panel remanded on this issue.

The panel affirmed the district court's grant of summary judgment in favor of prison officials with respect to plaintiff's Equal Protection challenge. The panel held that the district court properly concluded that plaintiff failed to raise a triable issue of fact with respect to whether the officers intentionally refused to provide him with a religious breakfast tray while providing the same to other inmates who were similarly situated.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Victoria L. Weatherford (argued) and Daniel H. Bookin, O'Melveny & Myers LLP, San Francisco, California, for Plaintiff-Appellant.

Jose Zelidon-Zepeda (argued), Deputy Attorney General, State of California, for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Plaintiff-Appellant Edward Terran Furnace appeals from the district court's grant of summary judgment in Defendants-Appellees' favor. Furnace alleges that the Defendants-Appellees, who are correctional officers at the prison where Furnace was incarcerated at the time of the alleged occurrence, violated his Eighth Amendment rights by spraying him with an excessive quantity of pepper spray. Furnace also alleges that his Fourteenth Amendment rights were disregarded when the officers denied him a vegetarian breakfast.

We reverse and remand on Furnace's Eighth Amendment claim, because the district court failed to draw all inferences in Furnace's favor when resolving the issue of qualified immunity in a summary judgment, but we affirm the district court's grant of summary judgment with respect to Furnace's Equal Protection challenge.

## FACTS AND PROCEDURAL BACKGROUND

During the time period relevant to this case, Furnace was an inmate at Salinas Valley State Prison (SVSP). He practices the Shetaut Neter religion, which requires its advanced practitioners to be vegetarians. As a result, Furnace was entitled to receive vegetarian meals, and he had received them without incident at SVSP for over a year.

Meals in Furnace's cell block were delivered through a food/handcuff port (food port), a rectangular slot in each jail cell door covered by a metal flap that can be opened from the outside by removing a padlock. The food port is about twelve inches wide and six inches tall.[1]

Operation Procedure 29 (OP 29) describes SVSP's policies regarding inmates and the food port, as follows:

> Inmates who take control of food/cuff ports create a serious immediate safety concern for staff and other inmates and mandates suspension of the programming of the other inmates housed in the unit. . . . It is imperative that the food/cuff port be secured in short order to enable inmates to continue to receive services.

---

[1] The district court's order granting summary judgment, which cites Furnace's estimate of the food port's size, describes the food port as being eighteen inches wide and seven or eight inches high. Record photographs of the food port, however, confirm our description of the food port's dimensions.

OP 29 also prescribes how officers are to react when inmates interfere with a food port:

> If during routine duties, correctional officers encounter an inmate who refuses to allow staff to close and lock his food/cuff port, the officers will verbally order the inmate to relinquish control of the food port and allow staff to secure it. The officer shall issue a warning that chemical agents will be used if he does not comply.

> If the inmate refuses to relinquish control of the food port, despite the warning, the officer is authorized to administer chemical agents against the inmate to secure the food port.

OP 29 also directs that if chemical agents are employed against an inmate, health care staff at SVSP are to allow the prisoner to decontaminate.

Defendants-Appellees, D.R. Morales, P. Sullivan, and J. Soto (collectively, the officers,) were on duty the morning of the events giving rise to this litigation, and were responsible for delivering breakfast to the inmates in Furnace's cell block. Neither of the officers was regularly assigned to work in Furnace's cell block, nor was either of them familiar with Furnace. Morales was assigned to distribute breakfast trays to Furnace and his cell mate on the relevant morning, and he approached Furnace's cell carrying a large platter with two or three meal trays on it.

Accounts of what happened next diverge dramatically. We begin with Furnace's account. Furnace claims he heard

Morales say something derogatory, which he contends was something to the effect of, "What's up with all these fuckin' Muslims over here?"[2] As Morales approached Furnace's cell, he held the food tray with one hand, and opened the food port with the other. Correctional staff rely on signs posted on the doors of prison cells to ascertain whether an inmate has been approved to receive a vegetarian meal. Morales claims that he did not see such a sign on Furnace's cell door. Inmates also keep a form called a "chrono" that lists their authorization to receive a vegetarian meal. Furnace concedes that he did not show the officers his chrono, though he had it in his cell at the time of the incident.

When Morales opened the food port on Furnace's cell, Furnace requested two vegetarian meals. Morales said, "You guys ain't vegetarian," closed the food port, and stepped out of view to speak with Soto. Morales then returned to the cell, opened the food port, and told Furnace that Soto had advised him that Furnace and his cell mate were not entitled to vegetarian trays. Morales next told Furnace to either accept the trays, or he would mark both Furnace and his cell mate down as having refused them.

Furnace then attempted to ask Soto to come to the cell door. He states that he attempted to do so by squatting down and putting his fingertips on the bottom portion of the open food port to balance himself, from which position he intended to call to Soto through the food port. He did not extend his hand or arm outside the food port. Without warning, Morales sprayed Furnace with pepper spray. Furnace put his hand up

_____

[2] The record does not contain details regarding the Shetaut Netur religion, though Furnace's brief on appeal states that it is entirely distinct from Islam.

to block the pepper spray, and grabbed the food port in the process. Sullivan saw that Morales was pepper spraying Furnace, came over, and also began pepper spraying him. Morales discharged his can of pepper spray at Furnace until it was empty. Furnace testified that he was pepper sprayed for "maybe a minute," and it was his perception that the officers unloaded the contents of two canisters of pepper spray on him.

Furnace was struck by pepper spray in the lower part of his face, on his chest, on his stomach, and on his groin area. The pepper spray caused his skin to blister and burn. He experienced a burning sensation for three or four days following the incident. After the incident, he also developed a rash in his groin area that he believes may have been caused by the pepper spray.

The officers' version of the events differs markedly from Furnace's. Morales claims that when he returned from conferring with Soto about whether Furnace was entitled to receive a vegetarian meal, Furnace abruptly forced the food port open and yelled, "fuck you!" Morales claims that he instructed Furnace to remove his hands from the food port, and that he told Furnace he had ten seconds to comply with his direct order. He avers that Furnace again said, "fuck you," and exhibited "an aggressive determination not to let go of the food port." Morales says that he discharged a one-second blast of pepper spray at Furnace in order to gain his compliance, and then ceased spraying because his canister was empty. Seeing Morales pepper spraying Furnace, Sullivan ran over to Furnace's cell, and began discharging pepper spray on Furnace from his own canister. Sullivan claims he discharged one blast of pepper spray on Furnace,

and that Furnace eventually withdrew his hands from the food port after Sullivan sprayed him.

It is undisputed that after Morales and Sullivan stopped spraying Furnace, Furnace was allowed to decontaminate in his cell.  He did not receive a vegetarian breakfast that morning.

Furnace brought several claims against the officers, two of which are at issue on appeal.  First, he claimed that Morales and Sullivan used excessive force in the way they used the pepper spray against him, in violation of the Eighth Amendment.  Second, he claimed that the officers violated his equal protection rights by not providing him with a vegetarian breakfast, even though they provided vegetarian meals to other similarly situated inmates.

The officers moved for summary judgment on both claims, which the district court granted.  Furnace appeals that order, claiming that the district court improperly resolved disputed issues of material fact in the officers' favor.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment and its qualified immunity determinations de novo.  *See Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).  "Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."  *Id*.  If, as to any given material fact, evidence produced by the moving party (the officers, in this case) conflicts with evidence produced by

the nonmoving party (Furnace, in this case), we must assume the truth of the evidence set forth by the nonmoving party with respect to that material fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1157–58 (9th Cir. 1999). With respect to qualified immunity determinations on summary judgment, we assess whether the contours of Furnace's Eighth Amendment right were clearly established with respect to the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001).[3] If the right was clearly established, we then ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.*

## DISCUSSION

### A.  Disputed Facts

The district court correctly determined that there were triable issues of material fact concerning whether Morales warned Furnace to remove his hands from the food port before pepper spraying him, and whether Furnace posed such a threat that Morales and Sullivan were justified in employing pepper spray against him.

The court also concluded, however, that Furnace did not raise a triable issue of material fact with respect to the amount of pepper spray that Morales and Sullivan used on Furnace, even though the quantity of pepper spray discharged by the officers is unquestionably material, because the amount of force used is central to a claim sounding in the alleged use of

---

[3] The Supreme Court has held that courts have discretion to determine the sequence of this inquiry. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

excessive force.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Furnace alleged that both Morales and Sullivan discharged their canisters of pepper spray on him until each canister was empty.  The court concluded that Furnace had not presented any evidence to support this claim.  Instead, the court credited the officers' statements that Morales discharged a one-second burst of pepper spray at Furnace and then stopped because his canister lacked pressure, and that Sullivan, seeing Morales struggling with his pepper spray canister, fired one burst of pepper spray at Furnace, but stopped as soon as Furnace removed his hands from the food port.

Furnace may have lacked a foundation to determine precisely how many canisters of pepper spray, if any, the officers depleted, but it does not follow that the court should therefore automatically adopt the officers' version of how much pepper spray they used.  *See Clement v. Gomez*, 298 F.3d 898, 902 & n.2 (9th Cir. 2002) (accepting on summary judgment the nonmovants' version of events despite the "considerable confusion" regarding the number, sequence, and duration of bursts of pepper spray).  As the district court noted, Furnace testified that he was pepper sprayed for "maybe a minute," and that he believed that officers Sullivan and Morales both emptied their entire canisters of pepper spray on him.

We are unable to reconcile the officers' testimony that they employed two quick blasts of pepper spray at Furnace with Furnace's own testimony that he was pepper sprayed for

up to a full minute, especially given the extent of Furnace's alleged injuries. The discrepancy between these accounts is too great to be capable of resolution on summary judgment. Accordingly, as it must do when ruling on a motion for summary judgment, the district court should have adopted Furnace's version of the events—that he was subject to repeated bursts of pepper spray for about a minute—when determining whether the officers were entitled to qualified immunity. Had it done so, as more fully discussed below, its analysis of whether the officers were entitled to qualified immunity at the summary judgment stage of the litigation, would have been affected.

Additionally, though the district court found that a triable issue of material fact remained as to whether Furnace posed a threat, it premised its award of qualified immunity to the officers on its determination that Morales could have mistakenly, but reasonably, perceived that Furnace posed a threat "when [he] held open the food port." Furnace denies that he held the food port open; he claims instead that he rested his fingers on the already-open food port for balance. This factual characterization is subtle, but is relevant to the question of whether Morales could have reasonably believed that Furnace posed a threat to the safety and security of the institution. Moreover, because the determination was made on a motion for summary judgment, the determination should have been made by drawing all inferences in Furnace's favor.

## B. Qualified Immunity

Furnace alleges that the officers violated his Eighth Amendment right to be free from cruel and unusual punishment by using excessive force against him when they pepper sprayed him. For purposes of a qualified immunity

analysis, the officers were clearly on notice of Furnace's Eighth Amendment rights in this case. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (qualified immunity is appropriate when "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). First and most generally, the "settled rule [is] that the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quotations omitted).

Second, "[p]rison regulations governing the conduct of correctional officers are also relevant in determining whether an inmate's right was clearly established." *Treats v. Morgan*, 308 F.3d 868, 875 (8th Cir. 2002) (citing *Hope v. Pelzer*, 536 U.S. 730, 743–44 (2002)). Prison regulations are drafted to further institutional safety and other prudential considerations, rather than being drawn to perfectly trace the contours of prisoners' constitutional rights. Accordingly, they are not wholly descriptive of the extent of those rights. However, in *Hope*, for example, the Supreme Court looked to rules promulgated by the Alabama Department of Corrections to aid it in determining whether a prison guard was on notice of constitutional limitations on the use of force. *Hope*, 536 U.S. at 743–44. Here, OP 29 bears directly on the situation that the officers confronted, and is therefore relevant to determining whether the officers could have thought their conduct was reasonable and lawful.

Third, although very few of our cases deal with constitutional limits on the use of pepper spray on confined inmates, it is clear that "[t]o determine that the law was clearly established, we need not look to a case with identical or even 'materially similar' facts." *Serrano v. Francis*,

345 F.3d 1071, 1077 (9th Cir. 2003) (citations omitted). We have previously found no constitutional violation where officers discharged less pepper spray than the amount Furnace alleges was sprayed on him in a case where, unlike here, prisoners were engaged in potentially life-threatening violence. *See Clement*, 298 F.3d at 901–02, 906 (no constitutional violation when officers applied two bursts of pepper spray into cell, each lasting five seconds, when one prisoner had another prisoner in a headlock, was punching him in the face and slamming his head against the wall, and threatening to kill him). We have also held "that use of [tear gas] in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979). We conclude that the principle articulated in *Spain* with respect to tear gas also applies to pepper spray. More broadly, we agree with our sister circuits that "[i]t is generally recognized that 'it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.'" *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984), *cert. denied*, 470 U.S. 1085 (1985)); *see also Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (denying qualified immunity to a prison guard because the right to be free from excessive use of pepper spray was clearly established). However, because, as one of our sister circuits noted, "[w]e do not require of such officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges," *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007) (internal quotation marks omitted), we place little

reliance on this particular premise in our qualified immunity analysis.

Our constitutional analysis in this case thus relies primarily on whether the force used by the officers caused unnecessary and wanton pain and suffering, as defined in *Hudson*, since that law was undoubtedly clear. "The question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (citations omitted). We have previously identified five factors set forth in *Hudson* to be considered in determining how the above question should be answered; namely, "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). The application of the *Hudson* factors to this case is therefore determinative of whether the force applied to Furnace was wanton and unnecessary.

First, we conclude that Furnace's injuries caused by the pepper spray were moderate, though relatively enduring for a chemical agent intended to cause only temporary discomfort. In addition to the pain of the initial contact, Furnace suffered from burns, blisters, and skin irritation that persisted for three or four days. Furnace also suffered from a rash on his groin that persisted for months, which may have been caused by the incident, though Furnace does not present any evidence demonstrating that the rash was caused by the spray.

Second, we conclude that it is not clear that the application of force was required under Furnace's version of the facts because Morales could have, as SVSP's OP 29 prescribes, simply ordered Furnace to remove his fingers from the food port rather than immediately discharging pepper spray on him. OP 29 directs correctional officers to "issue a warning that chemical agents will be used" likely because "the threat of the use of mace, except in a few instances, brings about compliance and in most instances, avoids any necessity of physical force." *Soto v. Dickey*, 744 F.2d at 1263 (summarizing the testimony of a prison superintendent and other prison officials). Officers cannot justify force as necessary for gaining inmate compliance when inmates have been given no order with which to comply.[4]

Third, we are not persuaded, after resolving all factual disputes in the light most favorable to Furnace, that the use of violent force, prior to a verbal warning, was necessary to gain Furnace's compliance. The force used—discharging bursts of pepper spray at Furnace for about a minute, such that one canister of pepper spray (whatever portion remained) was depleted and another was allegedly applied at some length—seems quite extensive and disproportionate relative to the disturbance posed by Furnace's fingertips on the food port. *See, e.g.*, *Clement*, 298 F.3d at 901–02 (two five-second bursts of pepper spray applied to prisoners beating each other and making homicidal threats).

Fourth, the district court properly found that it remained a disputed fact whether Furnace posed a threat to the officers,

---

[4] Spontaneous use of force can be necessary, though, in response to a perceived danger or threat, discussed under the fourth factor below.

such that they were justified in discharging pepper spray on him.  In Furnace's version of the facts, the threat posed by Furnace placing his fingertips on the edge of the food port was likely not great, if it was a threat at all.  Furnace was locked in his cell behind a large metal door, and had not, by his account, made any aggressive or threatening remarks, or taken any actions against Morales or anyone else.  Here, Furnace's most menacing act was to question Morales's decision not to deliver a vegetarian meal to him, and to try to communicate with Soto through the food port.  *See Treats*, 308 F.3d at 872–73 (pepper spray is not justified when an inmate only questions orders or seeks redress for an officer's actions).  The officers rely on OP 29 and their training for the proposition that prisoners who "take control" of food ports pose a "serious immediate safety concern" to other inmates and to prison staff.  As we have already noted though, OP 29 also directs that "[t]he officer shall issue a warning that chemical agents will be used" if the inmate takes control of the port; Furnace alleges he was given no warning.  The officers are entitled to qualified immunity for "reasonable, but mistaken, beliefs as to the facts establishing the existence of . . . exigent circumstances," *Saucier*, 533 U.S. at 206, and the district court granted qualified immunity on summary judgment largely on this premise.  However, Furnace's resting his fingers on the port appears *less* threatening than the situation described by OP 29, where an inmate "refuses to relinquish control of the food port, despite the warning."  We therefore disagree with the district court's conclusion that Furnace's actions, as he describes them, were reasonably perceived as an exigency that justified deviation from OP 29 and justified discharging pepper spray at Furnace without warning.

Fifth and finally, SVSP staff made an effort to temper the severity of their forceful response by allowing Furnace to decontaminate, and giving him medical treatment. This factor favors the officers.

Applying the *Hudson* factors to the facts as Furnace alleges them, we find that a significant amount of force was employed without significant provocation from Furnace or warning from the officers. We therefore conclude that qualified immunity was inappropriately granted at the summary judgment phase of this litigation. *See Martinez*, 323 F.3d at 1184 (reversing summary judgment on the issue of qualified immunity when the district court "resolved all material disputes in favor of the officers, based on their declarations alone"). We therefore reverse and remand the issue of qualified immunity to the district court for further proceedings.

We caution that we do not mean to suggest that any and every deviation from prison policy automatically jeopardizes a correctional officer's entitlement to qualified immunity. We are mindful that exigencies arise, and "[t]he point of qualified immunity is to allow officials to take action with independence and without fear of consequences." *Schwenk v. Hartford*, 204 F.3d 1187, 1198 (9th Cir. 2000) (citation and internal quotation marks omitted). However, barring urgency or exigent circumstances, that important interest is less compelling when the appropriate response to a situation has been prescribed by the prison's own written policies.

## C. Equal Protection

Furnace alleges that his right to equal protection was violated because he never received a vegetarian breakfast,

while vegetarian breakfasts were provided to other inmates who were similarly situated. "The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) (citation omitted). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

The first step in determining whether the officers violated Furnace's right to equal protection is to identify the relevant class to which he belonged. *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005). "The groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Id*. at 1167. The district court properly concluded that the relevant class of persons for comparative purposes was those inmates who defendants did not know had been approved to receive vegetarian meals for religious or other reasons. Because it is undisputed that the officers did not know that Furnace was entitled to such a meal, Furnace was not similarly situated to all other inmates who were approved to receive a vegetarian meal for religious reasons. *See id*. ("An equal protection claim will not lie by conflating all persons not injured into a preferred class receiving better treatment than the plaintiff.") (internal quotation marks omitted). The officers stated in sworn testimony that they had never met Furnace prior to the incident, and were not aware of Furnace's entitlement to a vegetarian meal. It is also undisputed that Furnace never showed them his chrono. Furnace offers no evidence to indicate the officers knew, or

had reason to know, about Furnace's religion or his entitlement to a vegetarian meal. Because Furnace adduces no evidence that he was treated any differently than any other inmate whom the officers did not know was entitled to receive a vegetarian meal, we affirm the district court's grant of summary judgment on Furnace's equal protection claim.

Furnace also argues that the officers denied him a vegetarian meal because they mistakenly believed he was Muslim, citing Morales's alleged statement about Muslims before he approached Furnace's cell. *See Estate of Amos ex. rel. Amos v. City of Page, Ariz.*, 257 F.3d 1086, 1094 (9th Cir. 2001) (in § 1983 suit under the Equal Protection clause, "alleged discrimination is no less malevolent because it was based upon an erroneous assumption"). However, Furnace cannot overcome his failure to show that he was treated differently than any other inmates in the relevant class—those the officers did not know were entitled to vegetarian meals. We also observe that the undisputed evidence showed that defendants provided vegetarian meals to all other inmates who they knew had been approved to receive such meals, including Muslims, regardless of their religious affiliation. Because the district court properly concluded that Furnace "failed to raise a triable issue of fact with respect to whether [the officers] intentionally refused to provide him with a religious breakfast tray while providing the same to other inmates who were similarly situated," summary judgment was appropriate on these claims.

## CONCLUSION

Because disputed issues of material fact in this case preclude summary judgment for the officers on the basis of qualified immunity, we reverse and remand on that issue. For

the reasons noted, the district court's denial of Furnace's equal protection claim is affirmed.

**REVERSED AND REMANDED in part and AFFIRMED in part.**