**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRENDA L. MARSH,

*Plaintiff-Appellant,*

v.

COUNTY OF SAN DIEGO; JAY S.
COULTER; DOES, 1 to 100,
inclusive,

*Defendants-Appellees.*

No. 11-55395

D.C. No.
3:07-cv-01923-
JLS-AJB

OPINION

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted
January 18, 2012—Irvine, California

Filed May 29, 2012

Before: Alex Kozinski, Chief Judge, Kim McLane Wardlaw
and Richard A. Paez, Circuit Judges.

Opinion by Chief Judge Kozinski

**COUNSEL**

Paul W. Leehey (argued), Law Office of Paul W. Leehey, Fallbrook, California, and Donnie R. Cox and Dennis B. Atchley, Law Office of Donnie R. Cox, Oceanside, California, for the plaintiff-appellant.

Deborah A. McCarthy (argued), Asst. County Counsel, Thomas E. Montgomery, County Counsel, County of San Diego, San Diego, California, for the defendants-appellees.

---

**OPINION**

KOZINSKI, Chief Judge:

When tragedy strikes and a family member suffers a violent death, we try to remember our dearly departed as they were in life, not as they were at the end. But suppressing gruesome mental images of their demise becomes difficult when autopsy or crime scene photographs are published for the world to see. We consider whether individuals have a federal privacy right to control public dissemination of a family member's death images.

I.   FACTUAL BACKGROUND

In 1983, Brenda Marsh's two-year-old son, Phillip Buell, died from a severe head injury while in the care of her then-boyfriend, Kenneth Marsh. Charged with Phillip's death, Marsh claimed that Phillip was injured when he fell off the couch and landed on the fireplace hearth. Marsh was convicted of second-degree murder and imprisoned. Almost two decades later, he filed a second habeas petition, which the San Diego County Superior Court granted at the request of the San Diego District Attorney. The DA's recently-consulted expert couldn't conclude beyond a reasonable doubt that Phillip was

the victim of child abuse. Marsh's conviction was set aside and he was released.

After his release, Marsh sued the County of San Diego and the medical personnel who conducted Phillip's autopsy. During this proceeding, Marsh's attorneys deposed Jay S. Coulter, the San Diego Deputy District Attorney who had prosecuted Marsh for murder in 1983. Coulter disclosed that, while he was Deputy District Attorney, he photocopied sixteen autopsy photographs of Phillip's corpse. Coulter also mentioned that, after he retired, he kept one of these as a "memento of cases that I handled." Coulter eventually gave a copy of this photograph, along with a memorandum he wrote titled "What Really Happened to Phillip Buell?", to a newspaper and a television station.

Brenda Marsh sued Coulter and the County of San Diego under 42 U.S.C. § 1983 alleging that the copying and dissemination of Phillip's autopsy photographs violated her Fourteenth Amendment Due Process rights. Defendants moved to dismiss the claims relating to Coulter's conduct after he retired, which the district court granted. The parties then cross-moved for summary judgment, which the district court granted in favor of defendants. Marsh appeals. We review de novo. *Zimmerman* v. *City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001) (motion to dismiss); *Smolen* v. *Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (summary judgment).

## II.   ANALYSIS

To prevail under 42 U.S.C. § 1983, a plaintiff must prove that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co.* v. *Sullivan*, 526 U.S. 40, 49-50 (1999). A plaintiff must also show that the federal right was "clearly established" at the time of the violation, otherwise government officials are

entitled to qualified immunity. *See Davis* v. *Scherer*, 468 U.S. 183, 191 (1984).

A.  Federal Right

Marsh claims she has a federal right to control the autopsy photographs of her child. She can't point to a federal statute guaranteeing this right, but she argues that such a right exists as a matter of substantive due process and also as a state-created liberty interest protected by procedural due process.

1.  Substantive Due Process

**[1]** The Supreme Court has recognized that "one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.' " *Carey* v. *Population Servs. Int'l*, 431 U.S. 678, 684 (1977) (quoting *Roe* v. *Wade*, 410 U.S. 113, 152 (1973)). This right to privacy protects two kinds of interests: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen* v. *Roe*, 429 U.S. 589, 599-600 (1977) (footnote omitted). With respect to the latter, we've held that the right encompasses the "most basic decisions about family and parenthood . . . ." *California* v. *F.C.C.*, 75 F.3d 1350, 1361 (9th Cir. 1996); *see also Roe*, 410 U.S. at 152-53 (noting that the constitutional right to privacy extends to marriage, procreation, contraception, family relationships, child rearing and education).

**[2]** No court has yet held that this right encompasses the power to control images of a dead family member, but the Supreme Court has come close in a case involving the Freedom of Information Act. *In National Archives and Records Administration* v. *Favish*, 541 U.S. 157, 170-71 (2004), the Court held that death scene photographs fell under an exemption to FOIA's general requirement of public access to gov-

ernment information, which carved out "law enforcement records or information . . . [that] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The Court found that the right to "personal privacy" included the "surviving family members' right to personal privacy with respect to their close relative's death-scene images." 541 U.S. at 170.

The Court had little difficulty "finding in our case law and traditions the right of family members to direct and control disposition of the body of the deceased and to limit attempts to exploit pictures of the deceased family member's remains for public purposes." *Id.* at 167. "Family members have a personal stake in honoring and mourning their dead and objecting to unwarranted public exploitation that, by intruding upon their own grief, tends to degrade the rites and respect they seek to accord to the deceased person who was once their own." *Id.* at 168.[1] Finding the right grounded in the common law, the Court had no need to determine whether it is also grounded in the Constitution. *See id.* at 170 ("It would be anomalous to hold in the instant case that the statute provides even less protection than does the common law.").

**[3]** Other courts have also recognized family members' privacy right in a decedent's death images. *See Melton* v. *Bd. of Cnty. Comm'rs of Hamilton Cnty.*, 267 F. Supp. 2d 859, 865 (S.D. Ohio 2003) ("[F]amilies have a right not to be embarrassed or humiliated by the outrageous display or exposure to public view of the remains of a loved one."); *Catsouras* v. *Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 874 (2010) (recognizing a violation of a right to privacy

---

[1]This privacy right belongs, not to the deceased, but to the survivors: " 'A privilege may be given the surviving relatives of a deceased person to protect his memory, but the privilege exists for the benefit of the living, to protect their feelings, and to prevent a violation of their own rights in the character and memory of the deceased.' " *Favish*, 541 U.S. at 168-69 (citing *Schuyler* v. *Curtis*, 147 N.Y. 434, 447 (1895)).

over death images where "publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern") (internal citations and quotation marks omitted). However, like *Favish*, these cases described the well-established common law right, not a constitutional right. So far as we are aware, then, this is the first case to consider whether the common law right to non-interference with a family's remembrance of a decedent is so ingrained in our traditions that it is constitutionally protected. We conclude that it is.

**[4]** A common law right rises to the level of a constitutional right if it is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Washington* v. *Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations and quotation marks omitted). The *Favish* Court considered our history and traditions, and found that "th[e] well-established cultural tradition acknowledging a family's control over the body and death images of the deceased has long been recognized at common law." *Favish*, 541 U.S. at 168. For precisely the same reasons, we conclude that this right is also protected by substantive due process.

**[5]** The long-standing tradition of respecting family members' privacy in death images partakes of both types of privacy interests protected by the Fourteenth Amendment. First, the publication of death images interferes with "the individual interest in avoiding disclosure of personal matters . . . ." *Whalen*, 429 U.S. at 599. Few things are more personal than the graphic details of a close family member's tragic death. Images of the body usually reveal a great deal about the manner of death and the decedent's suffering during his final moments—all matters of private grief not generally shared with the world at large.

**[6]** Second, a parent's right to control a deceased child's remains and death images flows from the well-established

substantive due process right to family integrity. *See Rosen-baum* v. *Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established."). The interest of parents "in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests . . . ." *Troxel* v. *Granville*, 530 U.S. 57, 65 (2000). A parent's right to choose how to care for a child in life reasonably extends to decisions dealing with death, such as whether to have an autopsy, how to dispose of the remains, whether to have a memorial service and whether to publish an obituary. Therefore, we find that the Constitution protects a parent's right to control the physical remains, memory and images of a deceased child against unwarranted public exploitation by the government.

**[7]** To violate substantive due process, the alleged conduct must "shock[ ] the conscience" and "offend the community's sense of fair play and decency." *Rochin* v. *California*, 342 U.S. 165, 172-73 (1952). Given that burial rites "have been respected in almost all civilizations from time immemorial" and "are a sign of the respect a society shows for the deceased and for the surviving family members," the *Favish* Court reasoned that unwarranted public exploitation of death images degrades the respect accorded to families in their time of grief. *Favish*, 541 U.S. at 167-68. Mutilation of a deceased family member's body, desecration of the burial site and public display of death images are the kind of conduct that is likely to cause the family profound grief and therefore "shocks the conscience" and "offend[s] the community's sense of fair play and decency." *Rochin*, 342 U.S. at 172-73.

**[8]** Marsh claims that when she learned that Coulter sent her son's autopsy photograph to the press, she was "horrified; and suffered severe emotional distress, fearing the day that she would go on the Internet and find her son's hideous autopsy photos displayed there."**[2]** Marsh's fear is not unrea-

---

**[2]**The *Favish* Court noted the decedent's sister suffered similar distress in its underlying case. She was "horrified and devastated by [a] photo-

sonable given the viral nature of the Internet, where she might easily stumble upon photographs of her dead son on news websites, blogs or social media websites. This intrusion into the grief of a mother over her dead son—without any legitimate governmental purpose—"shocks the conscience" and therefore violates Marsh's substantive due process right.[3]

## 2.    Procedural Due Process

**[9]** The Due Process Clause of the Fourteenth Amendment protects individuals against deprivations of "life, liberty, or property." "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson* v. *Austin*, 545 U.S. 209, 221 (2005) (internal citations and quotation marks omitted). Like property rights, liberty interests can be defined by state law. "States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin* v. *Conner*, 515 U.S. 472, 483-84 (1995). Once a state creates a liberty interest, it can't take it away without due process. *See Swarthout* v. *Cooke*, 131 S. Ct. 859, 862 (2011). A state official's failure to comply with state law that gives rise to a liberty or property interest may amount to a procedural (rather than substantive) due process violation, which can be vindicated under 42 U.S.C. § 1983. *See Carlo* v. *City of Chino*, 105 F.3d 493, 497-500 (9th Cir. 1997).

---

graph [already] leaked to the press," and wrote "I have nightmares and heart-pounding insomnia as I visualize how he must have spent his last few minutes and seconds of his life" and "[r]eleasing any photographs . . . would constitute a painful unwarranted invasion of my privacy, my mother's privacy, my sister's privacy, and the privacy of [the decedent's widow], her three children, and other members of [his] family." *Favish*, 541 U.S. at 167 (internal citations and quotation marks omitted).

[3]Only Coulter's attempt to publish the autopsy photograph is sufficiently shocking to violate Marsh's substantive due process right. We address Coulter's other instances of copying separately under procedural due process. *See* pp. 5903-04, *infra*.

Not every state law respecting privacy will create a liberty interest protected by the Constitution. "State law can create a right that the Due Process Clause will protect only if the state law contains '(1) substantive predicates governing official decisionmaking, and (2) explicitly mandatory language specifying the outcome that must be reached if the substantive predicates have been met.' " *James* v. *Rowlands*, 606 F.3d 646, 656 (9th Cir. 2010) (quoting *Bonin* v. *Calderon*, 59 F.3d 815, 842 (9th Cir. 1995)). In order to contain the requisite "substantive predicates," "the state law at issue must provide more than merely procedure, it must protect some substantive end." *Bonin*, 59 F.3d at 842 (internal citations and quotation marks omitted).

California Code of Civil Procedure § 129 states:

> [N]o copy, reproduction, or facsimile of any kind shall be made of any photograph, negative, or print, including instant photographs and video tapes, of the body, or any portion of the body, of a deceased person, taken by or for the coroner at the scene of death or in the course of a post mortem examination or autopsy made by or caused to be made by the coroner, except for use in a criminal action or proceeding in this state which relates to the death of that person, or except as a court of this state permits, by order after good cause has been shown and after written notification of the request for the court order has been served, at least five days before the order is made, upon the district attorney of the county in which the post mortem examination or autopsy has been made or caused to be made.
>
> This section shall not apply to the making of such a copy, reproduction, or facsimile for use in the field of forensic pathology, for use in medical, or scientific education or research, or for use by any law

enforcement agency in this or any other state or the United States.

Cal. Civ. Proc. Code § 129.

**[10]** The Legislative Counsel's Digest explained that the law serves California's policy of protecting "individuals and families against unconscionable invasions of their privacy" and that "[t]he reproduction, for unrelated or improper purposes, of any photograph of the body of a deceased person taken in the course of a post mortem examination or autopsy is contrary to such policy." The sponsoring Assemblymember, F. James Bear, described the purpose of section 129 as vindicating "the family of a deceased person['s] . . . right of privacy to limit reproduction of gruesome autopsy photographs." Thus, it's clear that this law was intended to create a liberty interest in a family member's death images. But to determine whether it is a liberty interest protected by the Constitution, we must look for the required substantive predicates and mandatory language. *James*, 606 F.3d at 656.

**[11]** Section 129 meets the first requirement because it contains substantive limits on official discretion. The law provides that no copy of an autopsy photograph may be taken except for use in a criminal action or a proceeding related to the death of that person. Cal. Civ. Proc. Code § 129. The law thus provides substantive criteria—whether an action is criminal or related to the death of the person—that cabins an official's discretion. *See Carlo*, 105 F.3d at 498-99.

**[12]** Section 129 also satisfies the second requirement of explicit and mandatory language limiting an official's discretion: "[N]o copy, reproduction, or facsimile of any kind *shall be made* of any [autopsy photograph] . . ." unless court approval is obtained or other specific exemptions apply. Cal. Civ. Proc. Code § 129 (emphasis added). These exceptions limit the protected liberty interest by allowing the use of autopsy images in criminal trials relating to the decedent, with

court approval, for use by law enforcement, or for medical and scientific education and research. *Id.*

Coulter's initial use of the autopsy photographs in the section 1983 case against Kenneth Marsh was clearly "for use in a criminal action or proceeding . . . which relates to the death of that person," Cal. Civ. Proc. Code § 129, and is therefore exempted. Marsh argues that Coulter's later instances of copying and distribution were not for permissible purposes under the statute. Coulter argues that he was entitled to access the autopsy photographs after the trial concluded because Kenneth Marsh brought successive habeas petitions and so the photographs might be necessary for any re-trial.

**[13]** It's debatable whether Coulter's retention of Phillip Buell's autopsy photograph after he retired is a violation of section 129. He had no need for the photograph for any criminal trial once he was no longer a prosecutor. But Coulter claims that the photograph was part of his training materials for child abuse detection seminars, and therefore falls under section 129's exemption "for use in medical, or scientific education or research." Cal. Civ. Proc. Code § 129. Marsh at least raises a triable issue of fact on whether Coulter had a valid educational purpose in keeping the photograph after he retired.

**[14]** It's clear that Coulter's submission of the autopsy photograph to the press after he retired was not for legitimate law enforcement, criminal investigation or educational purposes. Rather, it appears Coulter was frustrated that Kenneth Marsh's conviction was overturned, and wanted to prove that Marsh was in fact guilty by publishing his story, "What really happened to Philip Buell?", along with what he thought was a damning photograph. Coulter's interest in being vindicated in the court of public opinion is not the type of use that section 129 exempts. Marsh sufficiently alleges a violation of section 129 and, therefore, a deprivation of a state-created liberty interest.

The district court held that section 129 does not give rise to a state-created liberty interest because it believed that constitutionally protected interests are limited to core prisoners' rights. The court relied on *Sandin*, where the Supreme Court explained that state-created liberty interest, "will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. But this limitation only applies to cases involving prisons. *Sandin* doesn't speak to liberty interests created by generally applicable laws because the facts didn't present that issue. The Court in *Sandin* acknowledged that it wasn't performing the "ordinary task of construing a statute defining rights and remedies available to the general public." *Id.* at 481. Although the district court cited *Campbell* v. *Burt*, 141 F.3d 927 (9th Cir. 1998), which suggested that "[t]he Supreme Court has recently limited the doctrine to a certain core of prisoners' rights," *id.* at 930, we've recognized elsewhere that "the *Sandin* test appears to apply specifically to prisoners who have been convicted." *Carlo*, 105 F.3d at 498; *see also Picray* v. *Sealock*, 138 F.3d 767, 770 (9th Cir. 1998) (distinguishing *Sandin* from "other contexts [where] a state statute can create a liberty interest protected by the due process clause"). We know that statutory laws of general applicability *can* create a liberty interest that is constitutionally protected. *See, e.g.*, *Hicks* v. *Oklahoma*, 447 U.S. 343, 346 (1980); *Brittain* v. *Hansen*, 451 F.3d 982, 999-1000 (9th Cir. 2006); *Carlo*, 105 F.3d at 493, 498-99; *Meador* v. *Cabinet for Human Res.*, 902 F.2d 474, 477 (6th Cir. 1990); *Taylor ex rel. Walker* v. *Ledbetter*, 818 F.2d 791, 798-99 (11th Cir. 1987).

**[15]** In enacting section 129, California consciously and deliberately gave its citizens the right not to have government officials engage in unwarranted reproduction of autopsy photographs or other death images of deceased relatives. Once a state law creates that right, the Constitution steps in to protect it against deprivations without due process of law. Therefore,

Coulter's violation of section 129 provides an additional basis for Marsh's section 1983 claim.

### B.   Under Color of State Law

**[16]** In addition to proving the existence of a federal right, Marsh must show that Coulter was acting under color of state law at the time of the alleged violation. *See Long* v. *County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Coulter retired six years before he sent Phillip's autopsy photograph to the press. Marsh offered no evidence that Coulter jointly engaged with state officials in his conduct. *See Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). In his deposition, Coulter testified that he didn't ask for permission of the DA because he was acting as a private citizen. As a private citizen, Coulter's conduct isn't attributable to the state and can't form the basis of a section 1983 claim. "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 50 (internal quotation marks omitted).

Marsh claims that Coulter was acting under color of state law because he used his position as a state official to obtain the autopsy photographs. The actions of a former government employee, without more, cannot amount to state action. Rather, there must be some evidence of involvement by current government officials in the offending conduct. Otherwise, a state could be held liable for the misdeeds of all its former employees, expanding the scope of section 1983 beyond all reasonable bounds.

**[17]** Because Marsh has not alleged any misconduct by any person who, at the time of the alleged misconduct, was a government official, she fails to state a claim under section 1983 for Coulter's actions after he retired from public service. However, Marsh's allegation of improper photocopying prior to Coulter's retirement still stands because Coulter was

clearly acting "under color of state law" in his capacity as a state prosecutor. This would include Marsh's decision, while still employed by the County, to take the photograph out of the office and "give" it to himself as a private individual.

## C. Qualified Immunity

**[18]** Even if Coulter violated Marsh's constitutional rights under color of state law, he's entitled to qualified immunity because the right wasn't "clearly established" at the time of his conduct. *See Scherer*, 468 U.S. at 191. Qualified immunity creates a balance between "the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Carlo*, 105 F.3d at 500 (internal quotation marks omitted). This encourages officials to exercise their discretion without fear of liability when the state of the law is unclear. They can, therefore, be held liable only if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

Marsh claims that the right was "clearly established," relying on *Favish*, 541 U.S. 157 (2004), *Melton*, 267 F. Supp. 2d 859 (S.D. Ohio 2003), and *Catsouras*, 181 Cal. App. 4th 856 (2010). But these cases were decided after Coulter retired from his government position in 2000. Therefore, they were not established at the time Coulter was acting under color of state law.

Even including Coulter's later conduct, these decisions are insufficient to "clearly establish" a federal right to control dissemination of death images. Because *Favish* was decided in the FOIA context, a reasonable officer wouldn't have been on notice that the right applies outside the statutory context, as a separate constitutional right. Although the *Catsouras* court found a state privacy right over death images, it found no clearly established federal right and dismissed the section 1983 claim on qualified immunity grounds. 181 Cal. App. 4th

at 896. In any event, the opinions by a federal district court and an intermediate state court are insufficient to create a clearly established right. *Cf. Wilson* v. *Layne*, 526 U.S. 603, 616 (1999) (finding no clearly established law where the only cases cited were a state intermediate court decision and two unpublished district court decisions).

**[19]** Marsh also relies on California Code of Civil Procedure § 129, enacted in 1968, to demonstrate that the right was clearly established at the time of Coulter's conduct. But it was not clear, prior to today, that the statute created a *federally* protected right. For a section 1983 claim, "[i]t is not enough to say simply that the right was clearly established by the California statute." *Carlo*, 105 F.3d at 501. It must be clear that the state law created a right protected by the Constitution. The state statute, on its own, could not do that.

**[20]** As already noted, this is the first case to address the federal privacy interest in death images. While we believe the right is sufficiently grounded in federal law, we can't fault a state actor for failing to anticipate our ruling. Because it wouldn't have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001), Coutler is entitled to qualified immunity.

D. *Monell* Claim

**[21]** Marsh's claim against the County of San Diego also fails. *Monell* creates liability under section 1983 for municipalities where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell* v. *Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 (1978).

**[22]** Even if Coulter violated Marsh's constitutional rights while he was still employed as a prosecutor, his isolated

instance of photocopying is insufficient evidence of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by" the County. *Id.*; *see Oklahoma City* v. *Tuttle*, 471 U.S. 808, 823-24 (1985) (finding a single alleged violation insufficient for *Monell* liability).

Marsh argues that the County is liable under a "failure to train" theory. Although a failure to train can be a "policy" under *Monell*, there's no evidence that prosecutors—active or retired—often photocopy and distribute autopsy photographs for illegitimate purposes without the consent of the family. Thus, the county had no notice that training was necessary. Nor is a showing that a single employee was inadequately trained sufficient; there must be a "widespread practice." *Davis* v. *City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).

Furthermore, Marsh hasn't demonstrated that the absence of training on the handling of autopsy photographs constitutes "deliberate indifference" to her rights, or that the inadequate training "actually caused" the deprivation of her rights. *Merritt* v. *County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989).

## III.   CONCLUSION

Marsh has a constitutionally protected right to privacy over her child's death images. But, because Coulter wasn't acting under color of state law when he sent the autopsy photograph to the press, that claim must be dismissed. And, because there was no "clearly established" law to inform him that any of his earlier conduct was unlawful, Coulter is entitled to qualified immunity. Therefore, we affirm the district court's judgment.

**AFFIRMED.** Each party shall bear its own costs on appeal.