NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| VICTOR PEREZ, as Special Administrator of the Estate of Carlos Perez, deceased; and as the Guardian Ad Litem for S.E.P. and A.I.P., <br><br> Plaintiff-Appellee, <br><br> v. <br><br> JAMES GREG COX; et al., <br><br> Defendants-Appellants, <br><br> and <br><br> RAMOS; et al., <br><br> Defendants. | No.   17-17140 <br><br> D.C. No. 2:15-cv-01572-APG-CWH <br><br> MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

Argued and Submitted May 17, 2019
San Francisco, California

Before:  IKUTA and CHRISTEN, Circuit Judges, and MORRIS,[**] District Judge.

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]     The Honorable Brian M. Morris, United States District Judge for the District of Montana, sitting by designation.

Appellants ("Supervisor Defendants") are individual officials with the Nevada Department of Corrections and High Desert State Prison ("HDSP"). They appeal a portion of the district court's order denying Supervisor Defendants' motion to dismiss.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we review de novo a district court's denial of a motion to dismiss based on qualified immunity. *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012). Because the parties are familiar with the facts, we do not recite them here.

1. The Supervisor Defendants can be held liable on Plaintiff-Appellees' excessive force claim. A supervisor may be liable for purposes of § 1983 for his "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)). The Plaintiff-Appellees, members of the decedent Carlos Perez's family, allege that the Supervisor Defendants promulgated, maintained, or ratified—as well as trained, supervised, or controlled their subordinates pursuant to—the "actual practice,

---

[1] The dissent suggests that the Plaintiff-Appellees did not sue either the officer-trainee who shot Perez or the two corrections officers who encouraged the shooting. In fact, the Plaintiff-Appellees sued Ramos, Castro, and Smith (the officer-trainee and two corrections officers). None of the three moved to dismiss on qualified immunity grounds and thus are not parties to this appeal.

custom and *de facto* policy" to, *inter alia*: use live birdshot as a means of inmate control; encourage the use of deadly force to respond to non-deadly circumstances; and rely primarily on shotguns to maintain prison order. Inexplicably, the dissent focuses solely on the written policy, which it dubs "the Use of Force Regulation." It is well established that § 1983 liability may attach based on a "policy, *practice, or custom.*" *See, e.g., Pierce v. Multnomah Cty.*, 76 F.3d 1032, 1039 (9th Cir. 1996) (emphasis added). The dissent criticizes the majority for not citing the written policy, overlooking that the focus of the complaint is the "actual practice, custom, and *de facto* policy" the Supervisor Defendants adopted and condoned. The *written* policy is immaterial.

The Plaintiff-Appellees allege that the report published by the Association of State Correctional Administrators (ASCA), incorporated by reference in the complaint, shows a troublesome history of the use of birdshot in Nevada state prisons—a practice or *de facto* policy allegedly promulgated or ratified by the Supervisor Defendants and followed in practice by prison staff in spite of the Supervisors' awareness of the dangerous and potentially lethal consequences. Although the report was published after Perez's death, it details events that *predated* the events at issue in this case, and thus the Supervisor Defendants are presumed to have knowledge of that troubling history and to be responsible for

their own actions, inactions, or acquiescence in response to that history.[2]  The

Supervisor Defendants can be held liable on Plaintiff-Appellees' excessive force

claim.

2. The district court did not err by denying the Supervisor Defendants

qualified immunity on Plaintiff-Appellees' excessive force claim.  "Qualified

immunity involves two questions: (1) whether the defendant violated a

constitutional right, and (2) whether that right was clearly established at the time of

the alleged violation." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945

(9th Cir. 2017).

A.     The Constitutional Violation

Plaintiff-Appellees allege that the Supervisor Defendants violated Perez's

Eighth Amendment right to be free from cruel and unusual punishment by

---

[2]  The dissent argues that we should not presume knowledge of these events, but at
the 12(b)(6) stage it is reasonable to infer that prison supervisors knew of events
that took place within their prison. Over a two-year period, HDSP had 146
instances of guards firing birdshot, 48 of which involved firing live rounds.  Prison
staff themselves had been injured by birdshot and avoided intervention in inmate
altercations specifically because they feared being hit by birdshot.  The dissent
argues that these empirical findings have no bearing on whether prison officials
acted maliciously or sadistically for the purpose of causing harm.  But, as we
explained in *Robins v. Meacham*, 60 F.3d 1436 (9th Cir. 1995), another case
involving the use of birdshot in a Nevada prison: "the Eighth Amendment goes
further than to simply protect inmates from actions taken with an intent to punish;
it serves to protect the interests and safety of inmates." *Id.* at 1439.  The sheer
number of times HDSP guards fired birdshot inside the prison supports the
allegations of a *de facto* policy, practice, and custom to excessively and
unnecessarily use shotguns as primary means of control.

4

adopting and condoning a *de facto* policy, practice, and custom that caused corrections officers to shoot and kill Perez with a shotgun while trying to break up an altercation that otherwise could have been dispelled through lesser means of non-deadly force. Using excessive force against prison inmates is a violation of the Eighth Amendment. *See, e.g.*, *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002). Eighth Amendment claims reflect "the evolving standards of decency that mark the progress of a maturing society." *Beardslee v. Woodford*, 395 F.3d 1064, 1070 (9th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

Eighth Amendment claims require a two-part inquiry: (1) a "subjective" inquiry into whether prison staff acted "with a sufficiently culpable state of mind"; and (2) an "objective component" that asks whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)). The subjective inquiry for excessive force claims turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 6 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The objective component of an Eighth Amendment excessive force claim is "contextual and responsive to 'contemporary standards of decency.'" *Id.* at 8 (quoting *Estelle*, 429 U.S. at 103). In view of the contextual nature of this inquiry, the *Hudson* Court declined to establish a

5

categorical standard for the required showing of objective harm necessary to prove an Eighth Amendment excessive force claim. *Id.*

Five factors bear on the objective prong of the excessive force analysis: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013) (quoting *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003)). With these in mind, we turn to the objective prong.

The Plaintiff-Appellees allege that Perez's death was the direct result of the *de facto* policies, practices, and customs created, ratified, and maintained by the Supervisor Defendants allowing prison staff to use live birdshot rounds as a primary means of controlling inmates, regardless of the actual level of threat. Objectively, the *de facto* policy or practice of using shotguns inside a prison is excessive when other less lethal or non-lethal alternatives exist. Plaintiff-Appellees allege that HDSP inmates Carlos Perez and Andrew Arevalo "were handcuffed behind their backs, wearing nothing but underwear and merely kicking at each other's shins." At the 12(b)(6) stage, it is reasonable to infer from those allegations that Perez and Arevalo posed a relatively minor threat to corrections officers, given that they were both restrained and unable to conceal or access any

6

weapons, which in turn implies a lesser need for force. The Plaintiff-Appellees alleged that lesser means of force existed to temper the altercation between Perez and Arevalo, rather than firing multiple rounds of birdshot.  The ASCA report suggests that is, in fact, the case, but none were used.  Plaintiff-Appellees also alleged that, after the first shot hit Perez in the chest, knocking him to the ground, both Officers Smith and Castro continued to yell at COT Ramos to "[s]hoot 'em!" and COT Ramos ultimately fired three additional shots at the two men, based on the "unconstitutional practice to needlessly shoot inmates" and the "actual practice, custom, and *de facto* policy" of primarily relying on shotguns to maintain order within the prison.  The officers' response to this altercation, pursuant to the alleged *de facto* policies and practices, culminated in Perez dying "from multiple gunshot wounds to the head, neck, chest, and arms."  The complaint alleges that the practices tolerated at HDSP—allowing correctional officers to "needlessly shoot inmates" with birdshot and to "deploy deadly force in situations that do not require such force"—were the "moving force of the [alleged] constitutional violation." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc), *abrogated on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1994) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).  The complaint allegations satisfy the objective prong of the Eighth Amendment inquiry.

7

At this early stage, Plaintiff-Appellees also satisfy the subjective prong of the excessive force inquiry. They allege that, because the *de facto* policy or practice was to use birdshot in situations where lesser force would suffice and the Supervisor Defendants were on notice that birdshot had potentially lethal consequences, such use of force was not a "good faith effort to maintain or restore discipline," but rather used "maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6.

Both the objective and subjective components are corroborated by the ASCA report on "Use of Force Policy, Practices and Staff Training Regarding the Use of Shotguns in Nevada Prisons." The report supports the Plaintiff-Appellees' allegation that the *de facto* policies and practices were at least the moving force causing the constitutional violation. *Redman*, 942 F.2d at 1446. The report also makes clear that Nevada's policies, practices, and customs are "not consistent with nationally accepted correctional standards" or "best practices." Indeed, Nevada is an extreme outlier. HDSP had 146 instances of guards firing shotguns between 2012 and 2014, 48 of which involved firing live rounds—a staggering number compared to the next highest: 16 total firings at LCC. The report concluded prison staff relied on shotguns "heavily and almost exclusively . . . to maintain order" and "to protect inmates and staff from harm," that staff often went directly from verbal warnings to using a shotgun with "little or no physical intervention," and that staff

8

avoided intervening directly in inmate altercations in favor of firing blank or live birdshot rounds. According to the report, floor staff avoided other lesser means of intervention because "they didn't want to be hit by bird shot," recognizing that using birdshot in an enclosed space where nearly every surface is metal or concrete risked causing live rounds to ricochet and injure bystanders. The complaint alleges that, as supervisors, the Defendant-Appellants were charged with knowledge of that risk: in the three years before Perez's death, several bystander inmates uninvolved in the altercations that required intervention were injured by birdshot, including one bystander inmate who was blinded. The complaint alleges that three staff members also had been previously injured by "indiscriminate" and "unpredictable" birdshot. Indeed, even the dissent concedes the report found there was "routine deployment" of live birdshot rounds at HDSP. At the 12(b)(6) stage, the Plaintiff-Appellees state a plausible excessive force claim.

B.    The Clearly Established Right

The second part of the qualified immunity test requires that the constitutional right that has been violated was "clearly established" at the time of the alleged violation. *Isayeva*, 872 F.3d at 946. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "This is not to say that an official action is protected by qualified

9

immunity unless the very action in question has previously been held unlawful[.]" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (denying qualified immunity to prison guards who handcuffed an inmate to a hitching post as punishment, even though no earlier cases had materially similar facts). "Although there is no prior case prohibiting the use of this specific type of force in precisely the circumstances here involved, that is insufficient to entitle [the officer] to qualified immunity: notwithstanding the absence of direct precedent, the law may be, as it was here, clearly established." *Deorle v. Rutherford*, 272 F.3d 1272, 1285–86 (9th Cir. 2001). It is clearly established that an inmate has a constitutional right to be free from excessive force used maliciously and sadistically to cause harm. *Hudson*, 503 U.S. at 7. At this early stage, the Plaintiff-Appellees have sufficiently alleged that the *de facto* policies and practices at HDSP caused Perez to be subjected to malicious and sadistic lethal force without a good faith justification.

The dissent cites *Carpino v. Demosthenes*, 37 F.3d 1504 (9th Cir. 1994) (unpublished), to conclude that this court has already determined that a policy of skipping birdshot at inmates does not violate the Eighth Amendment. But the *de facto* policy and practices alleged in this case go far beyond skipping birdshot. The Plaintiff-Appellees allege the existence of *de facto* policies and practices allowing shotguns as the *primary* mechanism for controlling inmates and "encouraging the

10

use of deadly force, in non deadly force situations." Moreover, as *Hudson* instructs, the Eighth Amendment excessive force inquiry is "contextual and responsive to 'contemporary standards of decency.'" 503 U.S. at 6. As such, it must be measured against evolving norms and standards. The ASCA report reflects that the means of inmate control have evolved significantly since *Carpino* was decided 25 years ago, and that Nevada's *de facto* policies and practices allowing the use of shotguns to subdue and control inmates were decidedly out of step with the evolving norms and industry standards. The ASCA report expressly concluded that the *de facto* policy and practice allowing use of a deadly weapon in "some circumstances to achieve non-deadly results" was "a dated concept not in keeping with modern criminal justice use of firearms." Further, in the wake of *Carpino*, our court considered another Eighth Amendment claim involving Nevada's use of live birdshot in prison. *See Robins v. Meacham*, 60 F.3d 1436 (9th Cir. 1995). *Robins* involved a bystander inmate who was injured when corrections officers fired birdshot at a different inmate. *Id.* at 1440. The issue on appeal involved transferred intent. We affirmed the denial of qualified immunity and, significant for this appeal, explained that the conduct at issue clearly implicated the Eighth Amendment: "Whom the prison officials shot, Robins or Echavarria, is not relevant—what is relevant is that they fired a shotgun blast at an inmate. It is this conduct that the Eighth Amendment is designed to restrain." *Id.*

11

The dissent at times slips into a summary judgment standard, evaluating the persuasiveness of the ASCA report or assessing the record evidence. But at the motion to dismiss stage, the Plaintiff-Appellees have alleged sufficient facts to state a plausible Eighth Amendment claim for excessive force and the district court correctly denied qualified immunity to the Supervisor Defendants.

3. The district court did not err by denying the motion to dismiss Plaintiff-Appellees' deliberate indifference to serious medical needs claim against Lieutenant Oliver. An inmate must show "deliberate indifference to serious medical needs" to establish an Eighth Amendment claim arising from medical treatment while incarcerated. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle*, 429 U.S. at 104). "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) *overruled on other grounds by WMX Techs. Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). Plaintiff-Appellees allege that in the aftermath of the shooting, as Perez lay in an enormous pool of blood continuing to bleed profusely, Lieutenant Oliver spoke with COT Ramos instead of ensuring that Perez "received adequate medical attention" for "his urgent shotgun wounds." At this 12(b)(6) stage, the allegations that Lieutenant Oliver "responded to the scene after [Perez] was shot," but spoke to COT Ramos instead of assisting Perez, allow the

reasonable inference that Lieutenant Oliver arrived on the scene during the five-minute time period that elapsed between the shooting and when medical personnel arrived. Contrary to the dissent's characterization, the issue is not whether Lieutenant Oliver interfered with or failed to supervise medical personnel; the complaint alleges that Lieutenant Oliver "responded" to the scene, described by a bystander as "the biggest pool of blood" he had ever seen and he could never "have imagined an experience so horrific." The complaint alleges that Lieutenant Oliver spoke to Ramos rather than doing something to assess Perez's needs or stop his bleeding during the five minutes it took for medical personnel to arrive. At the 12(b)(6) stage, those allegations are sufficient to show deliberate indifference. *See, e.g.*, *Robins*, 60 F.3d at 1442 (affirming denial of qualified immunity on summary judgment record when observing officers failed to present evidence that "they did not have the opportunity to intervene" to prevent the use of birdshot).

4. <u>We decline to address the remaining issues on appeal</u>. Defendant-Appellants' failure to raise the issue of qualified immunity on Plaintiff-Appellees' loss of familial association claim with the district court does not "overcome our presumption against hearing new arguments." *See Dream Palace v. Cty. of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004). We likewise decline to exercise pendent jurisdiction over Defendant-Appellants' appeal regarding the district

13

court's denial of the motion to dismiss Plaintiff-Appellees' state law claims. *See*

*Kwai Fun Wong v. United States*, 373 F.3d 952, 960 (9th Cir. 2004).

**AFFIRMED.**

*Perez v. Cox*, 17-17140
IKUTA, Circuit Judge, dissenting:

According to the majority, the official policy at High Desert State Prison (HDSP) is to shoot inmates with shotguns for no reason. Maj. at 4–5. That is the majority's basis for concluding that the prison supervisors here ordered their officers to use deadly force in violation of the Eighth Amendment. Needless to say, neither the facts nor the law provides support for the majority's conclusion.

To establish a claim that prison officials used excessive physical force in violation of the Eighth Amendment, a plaintiff must demonstrate that the officials used force not "in a good-faith effort to maintain or restore discipline," but to "maliciously and sadistically cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). This inquiry involves a "subjective" component (whether the officials acted "with a sufficiently culpable state of mind"), and an "objective" component (whether the "alleged wrongdoing was objectively harmful enough to" violate the Eighth Amendment). *Id.* at 8 (internal quotation marks omitted).

In this appeal, Perez asserts liability not against Correctional Officer Trainee (COT) Ramos (who fired the shots) or the two corrections officers at the scene of the shooting, but against the officials whom he alleges are liable for promulgating the Nevada Department of Corrections's policy for use of force at its prisons,

Administrative Regulation 405 ("Use of Force Regulation").[1]  Given that there is

no vicarious liability for the actions of subordinates under § 1983, *see Hansen v.*

*Black*, 885 F.2d 642, 645–46 (9th Cir. 1989), Perez must establish that, by

promulgating the Use of Force Regulation, the officials used force maliciously and

sadistically (rather than for the purpose of maintaining order) by setting in motion

a series of acts by the corrections officers (or knowingly refusing to terminate a

series of acts by the officers) which the supervisors "knew or reasonably should

have known would cause" the officers to shoot Perez in the chest, causing his

death, *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011).

Perez fails to make plausible allegations to this effect.  COT Ramos did not,

---

[1] Contrary to the majority, Maj. at 3, neither the complaint nor Perez's
appeal claim that Department officials are liable for promulgating a de facto policy
that differs from the written Use of Force Regulation.  On appeal, Perez challenges
only the officials' written policy, and does not even mention the phrase "actual
practice, custom and de facto policy" on which the majority's analysis turns, Maj.
at 3.  In articulating claims against the prison officials, Perez's complaint likewise
relies on the ASCA report's analysis of the official Use of Force Regulation.  For
instance, in a section discussing "Leadership and Staff Implementation of
Department Use of Force Policy," the ASCA report states that due to low staffing
levels, the Department is in the position of "relying heavily and almost exclusively
to the use of weapons to maintain order."  Thus, in stating "that Nevada's "actual
practice, custom and de facto policy is to rely '*heavily and almost exclusively to
the use of weapons to maintain order*,'" the complaint is actually quoting from the
ASCA report's analysis of the Use of Force Regulation.  Thus, a fair reading of the
complaint and appeal makes clear that any liability of the prison officials must
stem, if at all, from their promulgation of the written policy.

as the majority claims, shoot Perez with a shotgun in the chest "pursuant to" the Use of Force Regulation.  Maj. at 7.  The Use of Force Regulation (which the majority does not cite) directs no such actions, but explains the limited circumstances in which birdshot can be used for the purpose of maintaining discipline.  It requires corrections officers to first fire a warning shot "directed away from [the] inmates."  "If the initial warning shot fails to stop the prohibited activity,[2] then . . . bird shot rounds may be fired into the ground (skip shot) near the problem inmates or disturbance."  Officers are required "to use the minimal amount of force necessary to contain, control, or correct an immediate situation/incident, which may be a threat to the safety and/or security of the institution."

While the majority claims the officials promulgated and trained their subordinates to follow a policy that allowed HDSP to "use . . . deadly force to respond to non-deadly circumstances," Maj. at 3, the Use of Force Regulation is to the contrary:  any force used "shall be equivalent to the threat exhibited by the inmate, and . . . shall cease immediately upon control of the incident," Staff are "required to intervene to halt" a use of force that "is either excessive or

---

[2] The policy states that the use of birdshot (whether as a warning or skip shot) can be used only "for control purposes," and is "never to be used to stop verbal abuse or other non-threatening behavior."

3

unnecessary," and must "immediately report their observations to the shift supervisor verbally and in a written report." COT Ramos violated this policy; that is why he was fired and prosecuted for manslaughter. Accordingly, Perez cannot show that any of the supervisory officials named in his complaint sadistically and maliciously intended to have prison staff use force in violation of the Eighth Amendment. The policy mandated precisely the opposite.

Nothing in the Association of State Correctional Administrators (ASCA) report, which was commissioned by the Nevada Department of Correction, is to the contrary. Rather, the ASCA report concludes that "[p]rison leadership and staff at each prison are working in good faith to implement the Department's Use of Force policy." The ASCA report indicates that the prison staff felt it necessary to rely on shotguns "to protect inmates and staff from harm" and to maintain discipline because staffing levels were extremely low. Although the use of shotguns (both with blanks and live birdshot rounds) at the High Desert State Prison was more frequent than at other prisons, the ASCA report found these higher numbers needed to be evaluated in light of the prison's role as a "reception center," which houses a uniquely transient and violent population. In its conclusions, the ASCA report recommends discontinuing "the routine deployment of the 12-gauge shotgun with 7 ½ bird shot on armed posts," but warns that "[i]mplementing this

4

recommendation can only be done after the Department" has implemented other recommendations, including making increases in the level of staffing.

In sum, the ASCA report indicates that officials and staff in Nevada prisons deemed the Use of Force policy to be necessary to maintain discipline and prevent injuries to prisoners and staff, due to the low staffing levels at Nevada state prisons. This conclusion effectively negates a necessary element of an Eighth Amendment claim, i.e., that the defendants used force not "in a good-faith effort to maintain or restore discipline" but to "maliciously and sadistically . . . cause harm." *Hudson*, 503 U.S. at 7. The report's recommendation that the Department make changes to staffing levels, increase supervision, and clarify its policies to bring them in line with current best practices sheds no light on whether officials had a culpable state of mind, given that the report was published after all relevant events in this case occurred. Moreover, prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Therefore, the majority's reliance on the ASCA report and its speculations regarding the officials' "presumed" knowledge, Maj. at 4, is misplaced, and the majority errs in concluding there was an Eighth Amendment violation at the first prong of the

qualified immunity analysis.[3]

And at prong two of the qualified immunity analysis, the majority points to no authority clearly establishing that the Use of Force Regulation actually promulgated by the Nevada Department of Corrections violates the Eighth Amendment. The Supreme Court has repeatedly stressed to courts, "the Ninth Circuit in particular," that for a constitutional violation to be clearly established, "existing precedent must have placed the . . . constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted).

The majority cannot identify a single case clearly establishing that a qualified policy of skipping birdshot violates the Eighth Amendment. Rather, we

---

[3] Indeed, even if the record supported the majority's speculations, the majority's reliance on the "presumed" knowledge of prison officials would be misplaced. Empirical findings as to the number of times shotguns were used in the state's prison system have no bearing on whether the prison officials acted "maliciously and sadistically for the very purposes of causing harm" in promulgating the Use of Force Regulations, *Hudson*, 503 U.S. at 6, particularly when the ASCA report concludes that prison staff relied on shotguns to "maintain order." Contrary to the majority, Maj. at 4 n. 2, *Robins v. Meacham* makes clear that "[w]here a prison security measure is undertaken to resolve a disturbance, the test is whether force was applied '*maliciously and sadistically for the very purpose of causing harm.*'" 60 F.3d 1436, 1440 (9th Cir. 1995) (citation omitted). By contrast, if an officer fires a shotgun loaded with birdshot "in a good faith effort to maintain or restore discipline," there is no Eighth Amendment violation. *Id.* at 1441.

have previously held that the practice does *not* violate the Eighth Amendment. *Carpino v. Demosthenes*, 37 F.3d 1054, 1994 WL 561840, at \*1–3 (9th Cir. Oct. 13, 1994) (unpublished) (skipping birdshot at feet of prisoner in an altercation with another prisoner does not constitute excessive force and is "a good faith effort to defuse a volatile situation that threatened prison discipline and security"). While the majority claims that "[t]he ASCA report reflects that the means of inmate control have evolved significant since *Carpino* was decided," Maj. at 8, the report itself does not clearly establish constitutional rights. *See Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012) (holding even "opinions by a federal district court and an intermediate state court are insufficient to create a clearly established right").

In sum, without bothering to point to any authority clearly establishing that the promulgated Use of Force Regulation violates the Eighth Amendment, the majority denies qualified immunity to the supervisors. How many times must we be told how to conduct such an analysis? *See Kisela*, 138 S. Ct. at 1152.

As to the Eighth Amendment claim against Lieutenant Oliver for deliberate indifference to serious medical needs, the record is devoid of any evidence that Lieutenant Oliver "intentionally den[ied] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed." *Estelle v. Gamble*,

7

429 U.S. 97, 104–05 (1976) (footnote omitted).  Medical personnel responded to the scene, and there is no allegation that Lieutenant Oliver interfered with their work.  Rather, the only factual allegation against Lieutenant Oliver is that he "spoke" with COT Ramos during this time.  Contrary to the majority's assertion, there is no allegation in the complaint that Lieutenant Oliver arrived before medical personnel did, let alone before medical personnel had been called.  Even if the majority is correct in stating that Oliver was present at the scene but "did nothing to assess Perez's needs or stop his bleeding" before medical personnel arrived (contentions not clearly supported by the complaint), *see* Maj. at 11–12, the majority cites no authority clearly establishing that Lieutenant Oliver had some obligation to provide immediate medical aid when responders were just minutes away (there is nothing in the record to suggest that Lieutenant Oliver had any medical training).  Indeed, a supervisor's intentional interference with the medical responders' work is more likely to violate the Eighth Amendment.  *See Estelle*, 429 U.S. at 104–05.  Accordingly, this claim likewise fails both prongs of our qualified immunity analysis.

Rather than apply settled law to the facts before us, the majority invents a policy requiring the sadistic use of force for the purpose of causing harm, and then declares it unconstitutional.

8

I dissent.